IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| CYNTHIA WELLER for | ) | |
| HELEN WELLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-3201-CV-S-NKL |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Pending before the Court is Cynthia Weller's Motion for Summary Judgment[1] [Doc. # 6]. Cynthia seeks judicial review of the Commissioner's denial of her request for disability benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq*. The Court finds that the Administrative Law Judge's decision was supported by substantial evidence in the record as a whole.

The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary.[2] Following a review of the entire record, the Court affirms the ALJ's decision.

**I.  Background**

---

[1] Cynthia Weller filed this action on behalf of her minor daughter, Helen Weller. To avoid confusion, the Court will refer to Cynthia and Helen by their first names.

[2] Upon review of the record and the law, the Defendant's position is found to be persuasive. Much of the Defendant's brief is adopted without quotation designated.

1

Helen was born in 1993 and she was eleven years old at the time of her hearing. The alleged onset date for her disability was September 1, 1998, and her alleged impairment was a "mental handicap." (Tr. 14, 52.) The hearing was held on June 17, 2004, and the ALJ issued her opinion on November 15, 2004.

A.  Medical Background

*1. School Assessments*

In February 2000, a school psychologist performed a series of tests on Helen. On the Wechsler Intelligence Scale for Children-Third Edition ("WISC-III"), Helen scored a verbal IQ score of 70, a performance score of 77, and a full scale IQ of 71. (Tr. 86, 90.) Helen had satisfactory grades in all subjects, but she was repeating her kindergarten year of school.

Helen's transcript lacks records from February 2000 to March 2003. Although she attended a school in Portland, Oregon, in 2002, Cynthia argues those documents are not relevant and Defendant appears to concur. Therefore, the Court will not consider those documents as part of the record in this case.

In March 2003, Helen's new school in Springfield, Missouri, assessed her and determined that she would spend about 40 percent of her time in special education classes. (Tr. 108-09.) In May 2003, the school performed another assessment and determined that Helen's full scale IQ score was 52, with a verbal IQ of 54 and a performance IQ of 58. (Tr. 148.) Testing on the Wechsler Individual Achievement Test-Second Edition ("WAIT-II") conducted in April 2003 showed that Helen, then in the third

2

grade, was performing at the upper first grade to lower second grade level. (Tr. 121, 153-54, 156.) She was noted to have strengths in her willingness to please and her ability to get along with others, although she also seemed sad and withdrawn. (Tr. 121-22.) The assessors believed that Helen was mentally retarded. (Tr. 156.)

On May 14, 2004, Helen's school performed another assessment. (Tr. 166.) On the WISC-III, Helen scored a full scale IQ of 67 and Helen's teachers agreed this was probably more accurate than her previous full scale IQ of 52, which was recorded in April 2003 on her prior WISC-III examination. The assessment revealed that Helen's reading and comprehension were challenges for her, but she was considered "proficient" in reading. She was noted to be behind in other areas, but overall her teachers noted a "great deal" of academic improvement. (Tr. 168.) Regarding her demeanor and personality, the assessment reflects that Helen was shy, but friendly, and she smiled often and was polite. Helen was satisfactorily organized, completed her work regularly, often went beyond what was expected, and usually returned her homework.

On August 11, 2004, Helen's classroom teacher completed a questionnaire. (Tr. 270-77.) Helen was noted to have many "serious" problems in all areas of the domain of acquiring and using information.[3] She required small groups, and much repetition to learn. Her reading and writing skills were several grade levels below her actual grade

---

[3]Teacher questionnaires have a variety of criteria and they ask the teacher to indicate the teacher's opinion of the subject's functioning on a five-point scale. On the scale, a 1 is equivalent to "no problem;" a 2 is equivalent to a "slight problem;" a 3 is equivalent to an "obvious problem;" a 4 is equivalent to a "serious problem;" and a 5 is equivalent to a "very serious problem."

3

level. Her math skills were one grade level below her actual grade level.

In the domain of attending and completing tasks, Helen's teacher believed her problems were less severe. Helen had a variety of "slight problems" but only a few "obvious problems." The teacher noted that Helen needed reminders when carrying out multi-step instructions and that she needed additional monitoring to stay on task and refocus when off task. In the domain of interacting and relating with others, the teacher opined that Helen had no problems at all. In conclusion, the teacher characterized Helen as a "wonderful" child who tried hard but still performed significantly below grade level in reading and written language. She also indicated that Helen was very respectful of her teachers and her peers and that she had started to interact more frequently during class. Helen's report cards from third and fourth grade reflect satisfactory grades in all categories.

### 2. Frances J. Anderson, Psy.D.

On February 16, 2004, Dr. Anderson examined Helen. Cynthia told Dr. Anderson that Zoloft had essentially alleviated Helen's symptoms of depression and headaches. (Tr. 204.) Dr. Anderson administered the WISC-III, but Helen's performance on the assessment was considered completely invalid because he believed that Helen was intentionally scoring poorly on the evaluation. (Tr. 206.) For example, Dr. Anderson saw Helen mark some correct answers before erasing them in favor of obviously wrong answers. (Tr. 206.) Dr. Anderson also observed Helen hold her pencil normally, but then change the holding position to a "whole handed, immature" position after she noticed that

4

Dr. Anderson was observing her. (Tr. 206.)

Dr. Anderson also believed that Helen's incorrect answers for very simple questions were suspicious, including (1) when asked the color of grass, she responded "black;" (2) when asked the sound that a dog makes, she responded "meow;" (3) when asked the shape of a ball, she responded "triangle;" and (4) when asked the color of the sky, she responded "orange." (Tr. 206-07.) Dr. Anderson noted that Helen was providing "sophisticated wrong answers for simple questions, indicating some effort on her part to derive incorrect responses . . . with a short response time." (Tr. 207.)

To summarize, Dr. Anderson noted that Helen's speech was articulate and coherent with no unusual mannerisms or gestures. Dr. Anderson opined "it would be difficult to rely on the reliability of anything [Helen] stated during the interview and testing session because of her responses." (Tr. 207.) Dr. Anderson further stated that the test results "place[] her in the Severely Retarded range of intelligence, which is not consistent with her behavior, verbalizations and previous assessments" and that her test scores were not consistent with her previous evaluations. (Tr. 206.) Thus, Dr. Anderson considered the test results to be totally invalid.

### 3. *Linda Smith, Psy.D.*

In April 2004, Dr. Smith assessed Helen and also found that she was malingering during testing. (Tr. 261.) During the assessment, Dr. Smith observed that Helen could differentiate between a "grandma maze" and a "grandpa maze" in the testing based on the genders of the figures in the maze. She could also keep track of the progress of the exam

and, when Dr. Smith pretended to lose track of their progress, Helen would redirect her to the correct question. For example, Dr. Smith would ask, "Where are we?" and Helen would respond with accuracy, "We are at number 14" or whatever the correct question was. (Tr. 261.) In another exam, Helen could respond to questions by marking "T" or "F" without having to be told what those letters represented. Finally, Dr. Smith placed a series of colored pencils on the table next to Helen and occasionally asked her to switch colors while she was distracted with another exam. Helen correctly chose the colored pencil that Dr. Smith requested, despite her professed inability to identify colors during an earlier portion of the examination.

Dr. Smith confronted Helen about her malingering and instructed her to "do the test without any pretending." (Tr. 262.) Helen expressed shock, but responded that the test "is hard." Despite her malingering on the earlier examinations, Dr. Smith assessed Helen as having a full scale IQ of 67. (Tr. 262.) Helen scored 75 in verbal comprehension, 67 in perceptual reasoning, 65 in working memory, and 83 in processing speed. (Tr. 262.)

## II. Discussion

The disability analysis for children involves a three-step sequential evaluation that takes into consideration (1) whether the child is working; (2) whether the child has a medically determinable "severe" impairment or combination of impairments; and (3) whether the child's impairment or combination of impairments meets, medically equals, or functionally equals the severity of an impairment in the listings. 20 C.F.R. § 416.924.

The ALJ found that Helen satisfied the first two prongs of the three-step analysis.

A claimant may satisfy her burden at step three of the childhood disability sequential evaluation process by showing that her impairment meets one of the listings found at 20 C.F.R. pt. 404, subpt. P, app. 1. Even if a claimant does not meet any specific listing, she alternatively may show that she has an impairment that is "functionally equal" to a listed impairment. Functional equivalent is shown by analyzing a claimant's functional limitations in the following domains:

1. Acquiring and using information;
2. Attending and completing tasks;
3. Interacting and relating with others;
4. Moving about and manipulating objects;
5. Caring for yourself; and
6. Health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i-vi). A medically determinable impairment or combination of impairments functionally equals a listed impairment if it results in "marked" limitations in two of these domains or an "extreme" limitation in one of the domains. A "marked" limitation is defined as a limitation that is "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation is the rating given to the worst limitations, although it does not necessarily mean a total lack or loss of ability to function. 20 C.F.R. § 416.926a(e)(3)(i).

### A. Helen's Impairments as Satisfying the Listings

Cynthia first argues that the ALJ erred by finding that Helen does not satisfy the listing for mental retardation, which is found in 20 C.F.R. Pt. 404, Subpt. P, App. 1, §

7

112.05. For a claimant to show that her impairment matches a listing, the impairment must meet all specified medical criteria. *See Deckard v. Apfel*, 213 F.3d 996 (8th Cir. 2000) (citing *Marciniak v. Shalala*, 49 F.3d 1350 (8th Cir. 1995)). Therefore, in order to show she is disabled under any of the subparts of section 112.05, Helen must show that she has "significantly subaverage general intellectual functioning with deficits in adaptive functioning" along with criteria listed in one of six subparts. For instance, if Helen suffers "deficits of adaptive functioning" and she has an IQ of 59 or less, she would be immediately found disabled under section 112.05C. Similarly, if she suffered from deficits of adaptive functioning, she had an IQ between 60 and 70, *and* she suffered from "a physical or mental impairment imposing an additional and significant limitation of function," then she would be considered disabled under section 112.05C. Thus, a higher IQ requires additional impairments in other functional domains while a lower IQ does not.

The ALJ determined that Helen's IQ was likely higher than 70. The Commissioner is not required to accept a claimant's IQ scores and may reject scores that are inconsistent with the record. *Clark v. Apfel*, 141 F.3d 1253 (8th Cir. 1998) (citing *Mackey v. Shalala*, 47 F.3d 951 (8th Cir. 1995)). Test results of this sort should be examined "to assure consistency with daily activities and behavior." *Id.* (quoting *Popp v. Heckler*, 779 F.2d 1497 (11th Cir. 1986) (per curiam)).

In this case, Helen's intelligence examiners clearly and unequivocally stated that her test scores were heavily tainted by malingering. *See Johnson v. Barnhart*, 390 F.3d

1067, 1071 (8th Cir. 2004) ("[Claimant] failed to provide a valid IQ test due to continual malingering."). Both Drs. Anderson and Smith concluded that Helen was modifying her behavior to appear more impaired than she actually was. Because of this behavior, Dr. Anderson refused to provide any diagnosis and stated that Helen's test results were completely invalid. Despite also finding evidence of malingering, Dr. Smith assessed Helen as having a full scale IQ of 67, with particularized scores of 75 in verbal comprehension, 67 in perceptual reasoning, 65 in working memory, and 83 in processing speed.

In addition to Drs. Anderson's and Smith's belief that Helen was intentionally diminishing her true capabilities on the examinations, there is further evidence that Helen was not functioning in the mentally retarded range. In 2000, Helen's IQ was between 70 and 77, and there is no evidence of an intervening factor that would have affected her intelligence. Moreover, her school progress, while showing that she was several grades behind in reading and comprehension, did not demonstrate mental retardation. Helen was performing very well in her mixed special education/normal class schedule, wherein she received excellent marks. With effort, Helen also was performing only one grade level behind in math and her teachers felt she had made a great deal of academic improvement.

Nonetheless, even assuming that Helen's IQ was 67,[4] she nonetheless would not be considered mentally retarded under the regulations because the record fails to

---

[4] Dr. Smith opined that Helen's full scale IQ was 67 in April 2004 and her school's assessment in May 2004 culminated in the same score.

9

demonstrate that the other aspects of her life show that she is mentally retarded. In the language of the listing, Helen does not have adaptive functioning deficits of the type contemplated by the listing. Section 112.05 and the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") provide that the diagnosis of mental retardation requires *both* subaverage general intellectual functioning *and* deficits in adaptive functioning. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1; DSM-IV 39 (4th ed. 1994).

The DSM-IV explains that adaptive functioning refers to how effectively individuals cope with "common life demands" and how well they meet the standards of personal independence expected of one in their particular age group, sociocultural background, and community setting. DSM-IV at 40. There are ten adaptive skills areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. *Id.* at 39. A diagnosis of mental retardation requires "significant limitations" in at least two of these areas. *Id.*

In the instant case, there is no evidence that Helen had a "significant limitation" in two of the above areas. There is no doubt that Helen experienced academic difficulties because of her limitations, but there is no evidence that she had substantial limitations in other areas of her life, such as her ability to communicate or interact with others. To the contrary, Helen's teachers and examiners all report a polite, well-adjusted child who can function independently and who has no manifested problems outside her academic challenges.

10

Moreover, the listings also require an "additional" limitation of function to qualify for benefits based on mental retardation. This third additional prong imposed by the listing is defined as "a physical or mental impairment imposing an additional and significant limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.05. Helen suffered from asthma, but she did not require treatment for this impairment for many years. Helen also had depression, but both she and her mother reported that her condition was alleviated with medication. (Tr. 204.) Therefore, even if Helen were assumed to be 70 or below, she was not disabled under section 112.05D because she did not have an additional and significant limitation of function.

Based on the foregoing and the record before the Court, the Court finds that the ALJ's determination that Helen was not mentally retarded under the applicable listings is supported by substantial evidence in the record. Because Helen's impairments do not satisfy the listings, the ALJ continued her analysis to determine whether her impairments were the equivalent of a functional limitation in one of the six domains listed above.

### B. Helen's Impairments as "Functionally Equivalent" to a Listed Impairment

In her opinion, the ALJ discussed Helen's level of functioning with respect to the six domains, including acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for herself, and her general health and physical well-being. The ALJ found that Helen did not have a marked restriction in two domains, nor an extreme limitation in one area.

First, Helen did not present any evidence that she had any serious difficulty in the domains of moving about and manipulating objects, self-care, or health and physical well-being. The ALJ's decision that Helen had less-than-marked limitations in these areas was supported by the evidence in the record.

The ALJ also found that Helen had a less-than-marked limitation in her ability to attend and complete tasks, which includes the extent to which the child begins, carries through, and finishes activities; and the ease with which she changes activities. 20 C.F.R. § 416.92a(h)(2)(iv) (school age children expected to follow directions, complete assignments, etc.). Helen's school reports noted that she was organized, completed her work regularly, and usually returned her homework. Helen's teachers also reported that she had few limitations in this domain, although she sometimes needed reminders and additional monitoring on multi-step instructions. Helen had no more than slight problems in most areas, such as focusing long enough to finish tasks, completing work assignments, and finishing her work on time. Based on her school reports and her teachers' reports of her conduct, the ALJ's decision that Helen did not have a marked limitation in her ability to attend and complete tasks was supported by substantial evidence in the record.

In the last domain of acquiring and using information, the ALJ also found that Helen had a less-than-marked limitation, but the Court does not believe this determination is supported by substantial evidence in the record. A "marked" limitation is defined as a limitation that is "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2)(i). Although Helen's teacher made a passing comment about her

improvement, her functioning skills reflected that she was not able to process information, particularly in the area of reading and writing. While the Court finds error in the ALJ's determination on this point, it is inconsequential because Helen did not have a marked limitation in any other domain and the listings require a marked finding in at least two of the domains listed above. Thus, even if the ALJ's finding had comported with the evidence in the record, Helen still would not be disabled under the applicable guidelines. The Court acknowledges that an "extreme" limitation would justify a finding of disability, but the Court does not believe such a finding is proper in light of the definition of "extreme limitation" in the guidelines.[5]

Because Helen was not markedly limited in two or more domains or extremely limited in one domain, the Court finds that the ALJ's determination that she was not disabled is supported by substantial evidence in the record.

## III.   Conclusion

Accordingly, it is hereby

ORDERED that Cynthia Weller's Motion for Summary Judgment [Doc. # 6] is DENIED. The decision of the Commissioner is affirmed.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

---

[5] An "extreme" limitation is the rating given to the worst limitations, although it does not necessarily mean a total lack or loss of ability to function. 20 C.F.R. § 416.926a(e)(3)(i).

DATE: <u>November 17, 2005</u>
Jefferson City, Missouri